In re Richard W. CILEK, Rosetta K. Cilek, Debtors.

**AMERICAN HONDA FINANCE CORPORATION, Plaintiff,**

v.

**Richard W. CILEK and Rosetta K. Cilek, Defendants and Third–Party Plaintiffs,**

v.

**DAIRYLAND INSURANCE AGENCY, INC., Third–Party Defendant.**

**Bankruptcy No. EU7–87–02102. Adv. No. 87–0276–7.**

United States Bankruptcy Court, W.D. Wisconsin.

April 13, 1990.

Jeffrey W. Guettinger, Eau Claire, Wis., for plaintiff.

Peter F. Herrell, Eau Claire, Wis., for defendants/third-party plaintiffs.

Randi L. Osberg, Chetek, Wis., for third-party defendant.

1. In the present case the court sees no significant difference between individual retirement accounts and individual retirement annuities.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

### PROCEDURAL POSTURE

On November 6, 1987, plaintiff American Honda Finance Corporation ("Honda Finance") filed a complaint against the defendants Richard W. Cilek and Rosetta K. Cilek ("Debtors") to except from discharge under 11 U.S.C. §§ 523(a)(4) and 523(a)(6) their claim of $10,355.00, plus interest and repossession costs.

On February 11, 1988, the Debtors filed a third-party complaint against the third-party defendant Dairyland Insurance Agency, Inc., ("Dairyland Insurance") seeking equitable subordination. On February 17, 1988, Honda Finance objected to the Debtors' claimed exemption of $17,017.56 in individual retirement annuities ("IRAs").[1] On June 28, 1988, Honda Finance filed a cross claim against the third-party defendant Dairyland Insurance for converting the proceeds from the sale of Honda Finance's collateral. On September 2, 1988, the Court ordered discovery completed by October 15, 1988. On November 1, 1988, the parties tried this adversary proceeding before the Court. On November 2, 1988, Honda Finance moved to admit new evidence of a security agreement dated August 1980. On December 1, 1988, the Court ordered the parties to submit briefs regarding the submission of new evidence.

On January 17, 1989, the Court ordered the trial to be continued to February 21, 1989, allowing Honda Finance to introduce new evidence and Dairyland Insurance to conclude its case. The Court also ordered the parties to submit briefs regarding the rights of the secured parties, Honda Finance and Dairyland Insurance, in the collateral. On February 21, 1989, the parties completed the trial in this adversary proceeding.

On May 29, 1989, the debtor, Richard Cilek (Debtor), died.

Accordingly, the Court will refer to both individual retirement accounts and individual retirement annuities as IRAs.

The debtors are represented by their attorney Peter F. Herrell of Jordan and Herrell; Honda Finance is represented by its attorney Jeffrey W. Guettinger of Herrick, Hart, Duchemin, Danielson & Guetinger; and Dairyland Insurance is represented by its attorney Randi L. Osberg of the Jost Law Office.

The issues presented by this matter are:

1) Whether the Debtor's IRAs are exempt under 11 U.S.C. § 522(d)(10)(E);

2) Whether the security interest of Honda Finance in the "spare parts" of Ladysmith Motors, Inc. ("Ladysmith Motors"), the Debtor's business, has priority over the security interest of Dairyland Insurance in the same collateral;

3) Whether the Debtor's failure to remit the proceeds of the sale of two motorcycles, secured to Honda Finance, creates a nondischargeable debt under 11 U.S.C. § 523(a)(6); [2] and

4) Whether Dairyland Insurance's control of the proceeds from the sale of Ladysmith Motors gives rise to equitable subordination under 11 U.S.C. § 510(c).

## ANALYSIS

### I. THE INDIVIDUAL RETIREMENT ACCOUNT

#### FACTS

On August 6, 1987, the Debtors filed a petition for relief with the United States Bankruptcy Court for the Western District of Wisconsin. The Debtors claimed Richard Cilek's individual retirement accounts with the National Guardian Life Insurance Company ("National Guardian") in the amount of $17,017.56 as exempt under 11 U.S.C. § 522(d)(10) and (11). On January 25, 1988, the Debtors filed an amended schedule B–4. The Debtors' amendment characterized the individual retirement accounts as annuities with National Guardi-

---

**2.** The Court finds no merit in Honda Finance's complaint under 11 U.S.C. § 523(a)(4). A fiduciary capacity must arise from an *express* trust. *In re Cooper*, 30 B.R. 484 (Bankr.App.Panel 9th Cir.1982). No such trust exists in the present case.

**3.** As mentioned earlier, the distinction between individual retirement accounts and individual

an. Contrary to the Debtors' characterization, the claimed exemptions are neither annuities nor individual retirement accounts but funds held in two individual retirement annuities.[3] When the Debtor reaches retirement age the funds will then be used to purchase an annuity. Accordingly, this Court shall treat the claimed exemption as individual retirement annuities and shall refer to the claimed exemption as IRAs.

#### STATUTES

11 U.S.C. § 522(d)(10)(E) states:

(d) The following property may be exempted under subsection (b)(1) of this section:

\* \* \* \* \* \*

(10) The debtor's right to receive–

\* \* \* \* \* \*

(E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless–

(i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under such plan or contract arose;

(ii) such payment is on account of age or length of service; and

(iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), 408, or 409 of the Internal Revenue Code of 1954 (26 U.S.C. 401(a), 403(a), 403(b), 408, or 409).

#### DISCUSSION

Honda Finance argues that the Debtor's IRAs are not exempt as a matter of law

---

retirement annuities does not affect the outcome of this case. However, had the claimed exemptions been annuities instead of individual retirement annuities the Court's lengthy analysis would have been unnecessary. Annuities are expressly exempt under 11 U.S.C. § 522(d)(10)(E) while IRAs are implicitly exempt by the term "similar plan" under 11 U.S.C. § 522(d)(10)(E).

because the Debtor is not presently receiving payments and the Debtor has the power to withdraw funds at any time. In the alternative, Honda Finance argues that the Debtor's IRAs are not reasonably necessary for the Debtors' support.

Courts denying exemptions for IRAs under 11 U.S.C. § 522(d)(10)(E) argue that IRAs are not exempt because: 1) the debtor has "no present rights to receive payments," *In re Heisey*, 88 B.R. 47 at 51 (Bankr.D.N.J.1988); 2) IRAs are not "similar plans" because the debtor has control of the funds, *In re Pauquette*, 38 B.R. 170 (Bankr.D.Vt.1984); 3) IRA benefits are not paid "on account of illness, disability, death, age, or length of service," *In re Fichter*, 45 B.R. 534 (Bankr.N.D.Ohio 1984); and 4) IRA payments are not "reasonably necessary for the support of the debtor," *Matter of Kochell*, 26 B.R. 86 (Bankr.W.D.Wis.1982).

## THE DEBTOR'S RIGHT TO RECEIVE A PAYMENT

In *In re Heisey, supra*, the court followed the reasoning of the Third Circuit Court of Appeals in *In re Clark*, 711 F.2d 21 (3d Cir.1983) and held that an IRA is property of the estate under 11 U.S.C. § 541(a), and is not exempt under 11 U.S.C. § 522(d)(10)(E). 88 B.R. at 51. In *In re Clark*, the Court of Appeals denied the debtor's exemption of a $17,466.00 Keogh retirement plan under 11 U.S.C. § 522(d)(10)(E) because the debtor had no present right to payment under the retirement plan. 711 F.2d at 23. The Court of Appeals reasoned:

> The general purpose of the exemption provisions of the Bankruptcy Code is to give debtors a fresh start. As noted in the House Report on H.R. 8200:
>
> > The historical purpose of [ ] exemption laws has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if

his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge. [This] purpose has not changed....

H.R.Rep. No. 595, 95th Cong., 1st Sess. 126 (1977) *reprinted in* 1978 U.S.Code Cong. & Ad.News, 5787, 5963, 6087. The exemption of present Keogh payments, to the extent they are necessary for the support of the debtor, is consistent with this goal. The exemption of *future* payments, however, demonstrates a concern for the debtor's long term security which is absent from the statute.

*Id.* For support, the Court of Appeals in *Clark* cited *In re Mendenhall*, 4 B.R. 127 (Bankr.D.Or.1980), *In re Richard Dale Clark*, 18 B.R. 824 (Bankr.E.D.Tenn.1982), and *Matter of Kochell*, 26 B.R. 86 (Bankr. W.D.Wis.1982).

This Court finds no support in the cases cited by the Court of Appeals in *Clark* for a rule which denies exemptions under 11 U.S.C. § 522(d)(10)(E) unless the debtor is receiving payments at the time of filing. *In re Mendenhall, supra*, was decided under the Bankruptcy Act; *In re Richard Dale Clark, supra*, was decided under the Tennessee exemption statute; and *Matter of Kochell, supra*, was decided on the basis that the pension plans in question were not reasonably necessary for the support of the debtor.

Unlike the Court of Appeals in *Clark*, this Court finds ample concern for the Debtor's long term security in the statute, the legislative history and the decisions of other courts. Both the subject of the statute (i.e., stock bonuses, pensions, profit-sharing plans and annuities) and the purpose of the statute (i.e., exemptions for the basic necessities) look to the future. Even the legislative history speaks of the future when it states: "Paragraph (10) exempts certain benefits that are akin to future earnings of the debtor." H.R.Rep. No. 595, 95th Cong., 1st Sess. 362 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6318.[4] Other courts have also found that

---

**4.** In a telling concurrence in *Clark*, Court of Appeals Judge Becker criticized the majority's assessment of congressional intent.

"The majority concludes that '[t]he exemption of *future* payments ... demonstrates a

concern for the debtor's long-term security which is absent from the statute.' I have substantial doubts that the majority has correctly assessed congressional intent, for the distinction required by the majority's reason-

Congress intended to look to the debtor's future needs as well as the debtor's current needs. *In re Miller,* 33 B.R. 549 (Bankr.D. Minn.1983); *In re Sheridan,* 38 B.R. 52 (Bankr.D.Vt.1983); *In re Flygstad,* 56 B.R. 884 (Bankr.N.D.Iowa 1986); *In re Grant,* 40 B.R. 612 (Bankr.N.D.Tex.1984); and *Matter of Boon,* 90 B.R. 988 (Bankr.W.D. Mo.1987).

While the present-tense wording of the statute may lead some courts to conclude that a debtor must presently be receiving pension payments to qualify for an exemption under 11 U.S.C. § 522(d)(10)(E), this Court believes that such an inference is not based upon the plain meaning of the statute. 11 U.S.C. § 522(d)(10)(E) does not explicitly require the debtor to begin receiving payments at the time the petition is filed. In fact, with the language "right to receive a payment *under* a stock bonus, pension, profitsharing, annuity, or similar plan" (emphasis added), 11 U.S.C. § 522(d)(10)(E) explicitly leaves the timing of payments to the terms of the debtor's plan. Furthermore, pension plans typically give participants a right to receive payment before they actually begin to receive payments. This concept is called vesting. Accordingly, this Court disagrees with those courts which limit the scope of 11 U.S.C. § 522(d)(10)(E) to those funds which a debtor is presently receiving under a stock bonus, pension, profitsharing, annuity or similar plan; the scope of 11 U.S.C. § 522(d)(10)(E) is limited by a debtor's right to receive payments under the plan, not to the present receipt of such payments.

... UNDER A STOCK BONUS, PENSION, PROFITSHARING, ANNUITY OR SIMILAR PLAN ...

■ Of those states which allow debtors to take the federal exemptions under 11 U.S.C. § 522(d) only one court has denied an exemption for an IRA under 11 U.S.C.

§ 522(d)(10)(E) because the debtor exercised control of the IRA funds. *In re Pauquette,* 38 B.R. 170 (Bankr.D.Vt.1984). The *Pauquette* court held that the debtor's individual retirement annuity was not exempt under 11 U.S.C. § 522(d)(10)(E). The court reasoned:

The legislative history of section 522(d)(10)(E) speaks to "benefits akin to future earnings of the debtor." House Report No. 95–595, 95th Cong., 1st Sess. 362 (1977), U.S.Code Cong. & Admin. News 1978, 5787, 6318. The intent is to ensure that such benefits are available for retirement purposes. The test which has developed to determine whether a contract provides benefits akin to future earnings is whether account funds may be used only for the purpose of providing retirement benefits to the contract holder or to his beneficiaries in the event of his death. The test is satisfied where account funds can be diverted to no other purpose than the retirement income of the contract holder: where access to the account funds can be achieved only upon the contract holder's disability, death, or retirement; where future payments, distributions, or return of capital may not occur except as an incident of disability, death, termination of employment, or retirement. Alternatively, where account funds may be withdrawn at any time by the contract holder, even if any early withdrawal assessment is an incident of the early withdrawal, the courts have unanimously rejected a claim of exemption under § 522(d)(10)(E).

*Id.* at 173–174. The *Pauquette* court cited the following cases for support: *In re Clark,* 711 F.2d 21 (3d Cir.1983); *Matter of Berndt,* 34 B.R. 515 (Bankr.N.D.Ind.1983); *In re Lowe,* 25 B.R. 86 (Bankr.D.S.C.1982); *In re Howerton,* 21 B.R. 621 (Bankr.N.D. Tex.1982); *In re Talbert,* 15 B.R. 536 (Bankr.W.D.La.1981); *In re Mace,* 4 BCD

---

ing effectively penalizes self-employed individuals for the form in which their retirement assets are held. The majority's holding will not affect employee pension and annuity plans created by employers, because the assets of such plans would not be included in the debtor's estate under section 541, and thus cannot be reached by the trustee. The assets of a Keogh plan, in contrast, are clearly assets

of the estate. (Footnote omitted) Thus Congress' putative lack of concern for the long-term security of the debtor works to the detriment only of self-employed debtors—a result I find inconsistent with Congress' manifest solicitude for retirement benefits for self-employed individuals."
711 F.2d at 23–24.

94 (Bankr.D.Or.1978); and *In re Brown*, 2 BCD 1661 (Bankr.S.D.Ohio 1976).

The cases cited by *Pauquette* do not support the court's statement that a test has developed to determine whether a contract provides benefits akin to future earnings, that such a test turns on whether the account funds may be used exclusively for retirement, and that such a test is satisfied where access can be achieved only upon disability, death or retirement. Nor do the cases cited by *Pauquette* support the broader proposition that the debtor's control of a pension plan puts that plan beyond the scope of 11 U.S.C. § 522(d)(10)(E). Finally, neither the cases cited nor this Court's research supports the contention that courts are unanimous on this issue.[5]

### 5. IRA UNDER STATE EXEMPTION LAWS WHICH DUPLICATE EXACT COPIES OF 11 U.S.C. § 522(d)(10)(E)

Of the states that do not allow debtors to choose the federal exemptions under 11 U.S.C. § 522(d) but do provide an exemption under state law exactly like 11 U.S.C. § 522(d)(10)(E), one court has granted an IRA exemption under state law incorporating 11 U.S.C. § 522(d)(10)(E). *In re Bell*, 1988 Bankr. Lexis 2142 (Bankr.D.Mont.1988).

In *Bell* the court found that "an IRA is exempt under 11 U.S.C. § 522(d)(10)(E) if it is shown to be 'reasonably necessary' for the support of the debtor and any dependent of the debtor." *Id.* However, the court failed to confront the argument that IRAs are not exempt because the debtor controls the funds. Accordingly, while this court agrees with the result in *Bell*, this Court does not rely on the *Bell* decision for support.

### IRA UNDER STATE STATUTES SIMILAR TO 11 U.S.C. § 522(d)(10)(E)

Of the states that do not allow debtors to choose the federal exemptions under 11 U.S.C. § 522(d) but do provide an exemption under state law similar to 11 U.S.C. § 522(d)(10)(E), two courts have denied an IRA exemption under 11 U.S.C. § 522(d)(10)(E) because of the debtor's control of the IRA funds, *In re Matthews*, 65 B.R. 24 (Bankr.N.D.Iowa 1986), and *In re Fichter*, 45 B.R. 534 (Bankr.N.D.Ohio 1984); but four courts have allowed such an exemption, *In re Fill*, 84 B.R. 332 (Bankr.S.D.N.Y.1988); *In re Fisher*, 63 B.R. 649 (Bankr.W.D.Ky.1986); *In re Kerr*, 65 B.R. 739 (Bankr.D.Utah 1986); and *In re Worthington*, 28 B.R. 736 (Bankr.W.D.Ky. 1983).

In *In re Matthews*, 65 B.R. 24 (Bankr.N.D. Iowa 1986) the court held that the debtor's IRA was not exempt under Iowa law. The court reasoned:

Pensions (for purposes of this decision, pensions, annuities and similar plans and contracts will be referred to as pensions) are generally defined as a stated allowance or stipend made in consideration of past service to help the recipient pay for expenses. Typically, the pension is established by someone other than the recipient (*e.g.*, his employer) and the recipient has little or no control over the fund. *Citations omitted.*

In contrast to the pension, control over an IRA lies almost exclusively in the recipient. The recipient is virtually free to determine the size and timing of deposits (subject to a $2,000.00 per year limit), the type of investment vehicle, and the size and timing of withdrawals. Further, although he must pay a penalty equal to 10 percent of the amount withdrawn before reaching age 59½, the recipient is free to withdraw funds from his account and use the funds for any purpose; not necessarily incident to the recipient's illness, disability, death, age or length of service. The key distinction between an IRA and a pension, then, is the recipient's virtually free access to his IRA funds and the lack of restrictions in the use of the funds.

*Id.* at 25. The *Matthews* court cites *In re Pauquette, supra; In re Fichter*, 45 B.R. 534 (Bankr. N.D.Ohio 1984); *In re Lowe, supra; In re Howerton, supra; In re Talbert, supra; In re Mace, supra;* and *In re Zimmerman*, slip op. (Bankr.S. D.Iowa 1984) for support.

No support exists in any of the cases cited by the *Matthews* court for denying the exemption of an IRA under 11 U.S.C. § 522(d)(10)(E) or under Iowa law. *See text* for discussion of *In re Pauquette, supra; In re Lowe, supra; In re Howerton, supra; In re Talbert, supra; In re Mace, supra; see below* for discussion of *In re Fichter, supra.*

In *In re Fichter* the court found that an IRA was not exempt under Ohio exemption law because an IRA is not payable "on account of illness, disability, death, age, or length of service" as required by Ohio law. *Id.* at 535. Despite the dissimilarity between the Ohio exemption statute and 11 U.S.C. § 522(d)(10)(E), the court examined congressional intent and bankruptcy case law to interpret the Ohio exemption statute. *Id.* at 537. The court reasoned: Since Congress intended to exempt payments "akin to future earnings," the court "must examine each benefit plan to determine if the payments have the same characteristics as wages paid by the employer." *Id.* Wages are paid by employers; IRAs are funded by individuals. *Id.* Wages are paid periodically; IRAs may be drawn upon in a lump sum. The court also found IRAs different from employer funded pension plans because the debtor receives a tax deferment and the debtor could withdraw funds at any time subject only to administrative expenses and tax penalties. *Id.* The court cited *In re Howerton, In re Talbert* and *In re Mace* for support.

As noted in the text, neither *Howerton, Talbert,* nor *Mace* provide support for the proposition that an IRA is not exempt under 11 U.S.C. § 522(d)(10)(E). However, the court notes that the *Fichter* court correctly cited the above cases

*See In re Clark, supra* (no discussion of control); *Matter of Berndt, supra* (control

for the general proposition that a number of courts consider the amount of control the debtor has over the funds extremely important when distinguishing pensions from IRAs.

This court disagrees with the reasoning of the *Fichter* court and gives little weight to such analysis in light of the substantial difference between the Ohio exemption statute and 11 U.S.C. § 522(d)(10)(E). The *Fichter* court misconstrues congressional intent by equating "future earnings" to "wages." "Earnings" also includes dividends and compensation for the use of capital. *Webster's Third New International Dictionary* at 714 (1986). Not only is the analogy in *Fichter* drawn too narrowly but the analogy is unartfully drawn as well. Wages like dividends may also be paid in one lump sum; many professional people who take payment for services receive their payment in a single lump sum. Furthermore, IRAs may be designed to pay the debtor periodically. The *Fichter* court's interpretation of 11 U.S.C. § 522(d)(10)(E) suffers because the issue before the court depended on a different statute, the Ohio exemption statute. Accordingly, this Court places little weight on *In re Fichter.*

In *In re Worthington*, 28 B.R. 736 (Bankr.W.D. Ky.1983), the court found that an IRA was exempt under Kentucky law. The court reasoned:

Each of the specifics named as well as the IRA program has the common theme of deferred tax liability on assets presently owned, and with the ostensible purpose to supplement retirement income in the future or provide benefits by reason of age, illness, disability, or death. There is no question but that the IRA account was a qualified plan pursuant to the Internal Revenue Code, 26 U.S.C. § 408(a), on the date the petition was filed.

The sophistication of deferred compensation plans and programs precludes an exhaustive identification of such arrangements, and thus, the phrase "similar plan or contract" must by its adoption include those plans closely parallel in nature to the specifics named. Therefore, it must be acknowledged that the legislature in enacting KRS 427.150 did not intend to restrict exempt status to only those arrangements expressly set forth therein, since it recognized the existence of other sophisticated benefit systems regardless of their generic term under the all-encompassing phrase "similar plan or contract." To be thus included the similar plan or contract must possess the characteristics of those programs expressly stated or be so parallel in nature as to serve the same goals or purposes. It is well recognized that IRA accounts do possess these traits in that benefits through contributions of a tax-deferred nature do flow to the debtor and his dependents under a formalized plan conditioned upon certain prospective elections or future events and mandating that such accounts to be deemed a qualified plan must adhere to rigid requirements monitored by the Internal Revenue Service.

The trustee argues that since the debtor had some degree of control over the funds in the IRA account and there is no guarantee said account will be retained until retirement, such assets must be deemed nonexempt and recoverable by the trustee for the benefit of creditors. There is no evidence to indicate that the establishment of the IRA was with intent to delay, hinder or defraud creditors of the payments made thereunder, and absent such intent, express or implied, the exemption statute is entitled to a construction liberal to the debtor. *Doethlaff v. Penn Mutual Life Insurance Company, et al.,* 117 F.2d 582 (6th Cir.1941). It must be noted the criteria relied upon by the trustee to justify denial of exempt status is without foundation. Debtor control over assets is not the determinant of whether exempt status exists. In addition, exempt status, achieved as of the date of filing, need not be guaranteed or continued thereafter for any specific period in order not to nullify its exempt status by a post filing action. Thus, the sole issue under the applicable state statute is whether the asset in question is exempt on the date of the filing of the petition for relief.

It is further recognized that many of the expressly exempt plans set forth in the statute repose in the participant certain controls and electives as exist in qualified IRA plans, and accordingly, the legislature in the enactment did not deem such retained elective controls impediments to the establishment of their exempt status.

28 B.R. at 739. In *In re Fisher,* 63 B.R. 649 (Bankr.W.D.Ky.1986), the court also found that an IRA was exempt under Kentucky law. In *In re Fill,* 84 B.R. 332, 338 (Bankr.S.D.N.Y.1988) the court, following the reasoning in *In re Donaghy,* 11 B.R. 677 (Bankr.S.D.N.Y.1981), held that an IRA was exempt under a New York exemption statute similar to 11 U.S.C. § 522(d)(10)(E). In *Donaghy,* the court found that a lump sum payment received three weeks before the debtors filed a petition for relief was a "tangible reflection" of a pension plan and "akin to future wages." *Id.* at 680. *In re Kerr,* 65 B.R. 739 (Bankr.D.Utah 1986) held that debtor's interest in a Keogh plan was exempt to the extent reasonably necessary for support.

**IRA UNDER STATES WITHOUT STATUTES SIMILAR TO 11 U.S.C. § 522(d)(10)(E)**

IRAs are exempt in thirteen of the thirty-five states which have chosen not to allow debtors to exempt assets under 11 U.S.C. § 522(d)(10)(E): Arkansas, California, Colorado, Florida, Idaho, Illinois, Kansas, Louisiana, Maryland, Mississippi, Ohio, Oregon, and Wyoming. *See 7 Collier On Bankruptcy,* p. 1, *et seq.* (15th ed. 1989).

The Court notes that under WIS.STAT. 815.-18(31) an IRA held by a self-employed debtor is exempt. *See In re Staniforth,* 116 B.R. 127 (Bankr.W.D.Wis.1990).

decisive factor in finding the savings portion of a pension fund was property of the estate, *not* an exemption under 11 U.S.C. § 522(d)(10)(E)); *In re Lowe, supra* (exemption denied because debtor was not receiving payment when he filed for relief); *In re Howerton, supra* (control decisive factor in finding IRA was property of the estate, *not* an exemption under 11 U.S.C. § 522(d)(10)(E)); *In re Talbert, supra* (court held that an IRA was not a pension, annuity, or gratuity payment by employer under Louisiana's distinct exemption statute, not 11 U.S.C. § 522(d)(10)(E)); *In re Mace, supra* (court held that an Oregon statute providing exemption for pension funds does not exempt a fund established by a person for his own benefit; accordingly, the debtor's IRA was not exempt under Section 6 of the Bankruptcy Act); and *In re Brown, supra* (court held that a qualified retirement annuity policy of insurance issued pursuant to Section 403(a) of the Internal Revenue Code was property of the estate under the Bankruptcy Act and was not exempt under either Ohio or federal exemption statutes). Accordingly, this Court declines to follow *In re Pauquette.*

Courts that continue to rely on control to analyze exemption issues fail to recognize the change brought about by the Bankruptcy Code. The question is no longer whether the IRA funds are property of the estate; the question is whether the IRAs are exempt under 11 U.S.C. § 522(d)(10)(E). In this case, the test is no longer whether the debtor has sufficient control so that his interest may be levied upon but whether the IRA is "reasonably necessary for the support of the debtor and any dependent."

While distinctions based upon a debtor's control of pension assets are rationally related to property of the estate under the Bankruptcy Act, such distinctions are without a rational basis when applied to exemptions under the Bankruptcy Code. *See In re Worthington, supra* at 739.

Under § 70(a)(5) of the former Bankruptcy Act the bankrupt's control of a pension asset was a helpful distinction in determining whether title to the bankrupt's pension assets passed to the trustee and whether pension assets became property of the estate.[6] *Compare Tennessee Valley Authority v. Kinzer,* 142 F.2d 833 (6th Cir. 1944) *with Hill v. Schaefer,* 221 F.2d 914 (5th Cir.1955). Under § 70(a)(5) of the Bankruptcy Act, the trustee took title to the bankrupt's "property, including rights of action, which prior to the filing of the petition [the bankrupt] could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered ..." Under common law, control was a badge of ownership and the purpose of § 70 of the Bankruptcy Act was to marshall property owned by the bankrupt for the benefit of the bankrupt's creditors. To test for control was logical because bankrupts couldn't transfer what they didn't control and creditors couldn't levy upon what bankrupts didn't own. Control related to both the purpose and the language of § 70 of the Bankruptcy Act.

In 1966 the test for determining property of the estate became one of measuring whether each asset in question was "sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as 'property' under 70a(5)."[7] *Segal v. Rochelle,* 382 U.S. 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428, 432 (1966). With this test,

**6.** § 70(a)(5) of the Bankruptcy Act states:

"(5) property, including rights of action, which prior to the filing of the petition [the bankrupt] ... could by any means have transferred or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered ..."

**7.** In *Segal v. Rochelle,* the Supreme Court considered the question whether potential claims for loss—carryback refunds constituted property of the estate under the Bankruptcy Act. *Id.*

382 U.S. at 377, 86 S.Ct. at 513. The Supreme Court reasoned:

The main thrust of § 70a(5) is to secure for creditors everything of value the bankrupt may possess in alienable or leviable form when he files his petition. To this end the term "property" has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed. E.g., *Horton v. Moore,* 110 F.2d 189 [ (6th Cir.1940) ] (contingent, postponed interest in a trust); *Kleinschmidt v. Schroeter,* 94 F.2d 707 [ (9th

concepts like control became factors in a test which balanced the incidences of ownership against the bankrupt's fresh start.[8]

Under the *Segal* test, determining whether an asset rooted itself in the prebankruptcy past appeared a simple and unchanging task. The phrase "rooted in the prebankruptcy past" limited the scope of inquiry to a definite period of time and created a strong image by which to judge an asset's connection to the prebankruptcy past. On the other hand, determining whether an asset entangled itself with the bankrupt's ability to make an unencumbered fresh start appeared a complex and changeable task. With its indefinite terms, the phrase "entangled with the bankrupt's ability to make an unencumbered fresh start" unchained the imagination.

At the time, the bankrupt's fresh start as granted by the discharge meant "that an individual's capital (as manifested in future earnings) as well as his future inheritances and gifts are freed of liabilities he incurred in the past." Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* at 227 (1986). *See Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). Unfortunately, no one knew what "future earnings" meant. Thirty-six years of confusion later, the Supreme Court created a test to determine exactly what constituted "future earnings." In *Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), the Supreme Court's decision turned on the actual function of the funds in question. However, in 1974 the test for "future earnings" became one of determining whether the funds in question were "designed to function as a wage substitute at some *future* period and, during that *future* period, to 'support the basic

---

Cir.1938) ] (limited interest in future profits of a joint venture); *see* 3 *Remington,* Bankruptcy §§ 1177–1269 (Henderson ed. 1957). However, limitations on the term do grow out of other purposes of the Act; one purpose which is highly prominent and is relevant in this case is to leave the bankrupt free after the date of his petition to accumulate new wealth in the future. Accordingly, future wages of the bankrupt do not constitute "property" at the time of bankruptcy nor, analogously, does an intended bequest to him or a promised gift—even though state law might permit all of these to be alienated in advance. E.g., *In re Coleman,* 87 F2d 753 [ (2d Cir.1937) ]; *see* 4 Collier, Bankruptcy 70.09, 70.27 (14th ed 1962). Turning to the loss—carry back refund claim in this case, we believe it is sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start that it should be regarded as "property" under § 70a(5).
*Id.* at 379–380, 86 S.Ct. at 514–515. Even though the debtor qualified for the refund after the petition was filed, the refund was still property of the estate because passing title to the trustee did not affect the likelihood of a refund or the debtor's fresh start. *Id.* at 380, 86 S.Ct. at 515.

**8.** In *Lines v. Fredrick,* 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), the Supreme Court held that accrued but unpaid vacation pay of a bankrupt wage earner did not pass to the trustee in bankruptcy as "property" of the estate. The Court distinguished the case from *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428, by contrasting the sources of the funds. In *Segal* the tax refund arose out of business losses while in *Lines* the accrued vacation pay arose

out of hourly wages. *400 U.S. at 20, 91 S.Ct. at 114.* The Court also noted: "The function of their accrued vacation pay is to support the basic requirements of life for them and their families during brief vacation periods or in the event of layoff." *Id.*

> The wage-earning bankrupt who must take a vacation without pay or forgo a vacation altogether cannot be said to have achieved the "new opportunity in life and [the] clear field for future effort, unhampered by the pressure and discouragement of preexisting debt," *Local Loan Co. v. Hunt, supra* [292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ] which it was the purpose of the statute to provide.

*Id.*

In *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974), the Supreme Court held that the bankrupt's income tax refund is "property" passing to the trustee under § 70(a)(5) of the Bankruptcy Act. The Court distinguished this tax refund from the vacation pay in *Lines* by contrasting the functions of the funds. The Court reasoned:

> [T]he vacation pay in *Lines* was designed to function as a wage substitute at some *future* period and, during that *future* period, to "support the basic requirements of life for [the debtors] and their families …" *Ibid.* This distinction is crucial.

*Id.* 417 U.S. at 648, 94 S.Ct. at 2435. The Supreme Court rejected its previous rationale when it stated:

> Just because some property interest had its source in wages … does not give it special protection, for to do so would exempt from the bankrupt estate most of the property owned by many bankrupts, such as savings accounts and automobiles which had their origin in wages.

*Id.*

requirements of life for [the bankrupts] and their families ...' " *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974) *quoting Lines v. Frederick*, 400 U.S. at 20, 91 S.Ct. at 114, 27 L.Ed.2d 124. Accordingly, after *Kokoszka*, to determine whether pension benefits were ·property of the estate one merely weighed the prebankruptcy incidences of ownership against a debtor's ability to earn money in the future free from encumbrances.

9. In *Matter of Turpin*, 644 F.2d 472 (5th Cir. 1981), the Court held that the bankrupt's interest in two trusts created by the employer to provide retirement benefits for employees was not property of the estate. The Court seized on language from *Kokoszka* and *Lines* which led it to consider the funds' function to decide whether the funds were property of the estate. *Id.* at 474.

> [T]he Supreme Court has reasoned that the bankrupt's future wages and assets "designed to function as a wage substitute at some future period and during that future period to 'support the basic requirements of life for [the debtors] and their families....' " *Kokoszka, supra* 417 U.S. at 648, 94 S.Ct. at 2435 (quoting *Lines v. Frederick, supra* 400 U.S. at 20, 91 S.Ct. at 114), do not fall within the category of property which passes to the trustee pursuant to § 70a(5).

*Id.* The Court concluded as it had in *Nunnally*, "that retirement benefits were assets designed to provide the bankrupt with a substitute for wages at some point in the future and thus the bankruptcy trustee had no claim to them under § 70a(5)." *Id.* The trustee distinguished *Nunnally* on its facts, arguing that the bankrupt in *Nunnally* needed the pension for a fresh start while the bankrupt in *Turpin* did not need the pension. *Id.* at 475. The Court replied:

> This reasoning misconceives the rationale of *Nunnally* and thus misses its application to this case. Our conclusion in *Nunnally* that giving title to the bankrupts retirement benefits to the trustee in bankruptcy would unduly hamper the bankrupt's fresh start was not based on a belief that the retirement funds were necessary to get the bankrupt back on his feet in the period immediately following the bankruptcy. Indeed it appears that in *Nunnally* as here the bankrupt was not even entitled to receive any of these benefits until some time in the future. In *Nunnally* we concluded that awarding the bankrupt's retirement benefits to the trustee would deprive the bankrupt of a genuine fresh start not because of the bankrupt's immediate need for the funds but because to recognize the trustee's claim against the funds would leave a cloud of pre-bankruptcy debt hanging over

When the bankruptcy courts applied the *Segal–Lines–Kokoszka* test to self-settled pension plans, some courts found such plans similar to "future earnings" and any claim upon such funds an entangling encumbrance to be eliminated by excluding the plan from the property of the estate. *Matter of Turpin*, 644 F.2d 472 (5th Cir. 1981); *In re Nunnally*, 506 F.2d 1024 (5th Cir.1975); *Matter of Parker*, 473 F.Supp. 746 (W.D.N.Y.1979); [9] and some courts found such plans similar to savings ac-

> the bankrupt's future. Providing the bankrupt with a "fresh start" means assuring him that assets to which he may become entitled *in the future* will be acquired free of any pre-bankruptcy obligations. Future wages may not be garnished to pay those obligations and pension benefits received in the future, even though they may be the product of pre-bankruptcy contributions to a pension fund, are a substitute for future wages and thus pass to the bankrupt free of the claims of pre-bankruptcy creditors.

*Id.* at 475.

In *In re Nunnally*, 506 F.2d 1024 (5th Cir. 1975), the 5th Circuit Court of Appeals held that the bankrupt's naval retirement benefits did not pass to the estate. The Court reasoned that:

> if the interest is designed to function as a wage-substitute at some *future* period, to "support the basic requirements of life for" [the debtor], *Kokoszka, supra,* 417 U.S. at 648, 94 S.Ct. at 2435, 41 L.Ed.2d at 380, and removal of the interest would hamper the bankrupt's efforts to make a new start, the property does not pass to the trustee. The pension payments here fall in the second category; they are periodic payments made during a time when the pensioner may well have no or few other sources of income.

*Id.* at 1026.

In *Matter of Parker*, 473 F.Supp. 746 (W.D.N. Y.1979), the court found that the bankrupt's pension did not constitute property of the estate because the funds were designed as a substitute for future wages necessary to obtain a fresh start. *Id.* at 751. "Through the enactment of ERISA, Congress established a comprehensive federal regulatory scheme designed to protect the growing number of employees who were participating in private pension plans." *Id.* at 750. The court also criticized distinctions based on control.

> Judge McGuire expressed reservations over the fundamental fairness of using control factors as a basis for decision because the analysis by negative implication suggests that the trustee would succeed to pension funds if one of the contingencies, such as physical disability or economic disaster, occurs on the eve of retirement.

counts under the bankrupt's control and rooted in the pre-bankruptcy past. *Matter of Baviello,* 12 B.R. 412 (Bankr.E.D.N.Y. 1981).[10] While most courts paid lip service to the *Segal–Lines–Kokoszka* test, little balancing actually occurred. *Matter of*

*Id.* at 750–752.

10. In *Matter of Baviello,* 12 B.R. 412 (Bankr.E.D.N.Y.1981), the court held that the debtor's Keogh plan is property of the estate under 11 U.S.C. § 70(a)(5). The court stated as follows:

> [T]he courts must look to the purpose of the Bankruptcy Act in an effort to determine, on a case by case basis, whether a bankrupt's interest in property passes to the trustee under section 70(a) of the Act. [citations omitted] One such purpose of the Act is to leave the bankrupt free after the date of his petition to accumulate new wealth and have a fresh start in life. [citations omitted] The main thrust of section 70(a), however, is to "secure for creditors everything of value the bankrupt may possess in a lienable or leviable form when he files his petition." [citations omitted]
>
> \* \* \* \* \* \*
>
> In order to accommodate these competing ends, a rule of thumb has been developed by which a property interest is considered to be property of the estate under section 70(a) of the Act if it is "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start." *Segal v. Rochelle,* 382 U.S. at 380, 86 S.Ct. at 515.

*Id.* at 414–415. The court followed the reasoning of *In re Mace,* 4 BCD 94 (D.Or.1978), distinguishing the case from the decision in *Matter of Parker,* 473 F.Supp. 746 (W.D.N.Y.1979). In *Mace* the bankrupt's control of the IRA belied the argument that the account was intended to be a substitute for future wages and the court treated the IRA as property of the estate. In *Parker* the court held that a qualified ERISA pension plan did not constitute property of the estate under § 70(a) of the Act despite the debtor's ability to designate a beneficiary, to borrow against the fund or to apply to withdraw funds in case of hardship. *Id.* at 751. However, the *Baviello* court incorrectly characterized the *Parker* court's findings and conclusions in order to create a distinction between *Parker* and *Baviello* where none existed.

The *Baviello* court stated:

> Finding that these limitations on the bankrupt's control effectively precluded use of the fund for any purpose other than the future support of the bankrupt and his dependents, the [*Parker*] Court concluded that the fund was intertwined with the bankrupt's ability to make an unencumbered fresh start and that it should be preserved for his benefit rather than the estate's.

*Short,* 507 F.2d 425 (8th Cir.1974).[11] Some courts preferring their own visceral reaction against exemptions to the Supreme Court's legal reasoning totally ignored the *Segal–Lines–Kokoszka* test. *In re Mace,* 4

*Id.* at 415. The *Parker* court neither found such facts to be true nor based its decision upon such facts. The *Parker* court found:

> ... that the bankrupt's pension credits do not constitute property under the above principles. The first and foremost factor in my decision is the purpose underlying ERISA of preserving income for retirement years ... It is apparent that Congress sought to ensure that anticipated retirement benefits would in fact be available at retirement to function as a source of income to retired employees and their families. I therefore agree with Judge McGuire's conclusion that the bankrupt's pension credits are designed as a substitute for future wages necessary to obtain a fresh start.

*Supra* at 750–751. The *Parker* court's discussion of control spoke not to limitations which precluded using the fund for any purpose other than future support but to powers which "were carefully limited in order to take advantage of tax deferral provisions of the Internal Revenue Code." *Id.* at 751.

In analyzing the facts, the *Baviello* court states:

> [T]he bankrupt had complete control over this asset at all times. Included among his rights under the plan were the rights to withdraw all or part of his contributions (this was limited to the lesser of his contributions or the account balance), and to direct the plan's manager-trustee to buy and sell securities from brokers of the bankrupt's choice. At no time did the bank exercise any control over the fund's management. These are indicia that this fund need not function as a substitute for future wages unlike the plan considered in *Parker* and, as in *Mace,* that the fund is sufficiently rooted in the prebankruptcy past to be treated as property of the estate which passes to the trustee on the date of bankruptcy.

*Id.* at 415.

11. For example, in *Matter of Short,* 507 F.2d 425 (8th Cir.1974), the court held that the bankrupt's accrued contributions to the state's public school retirement system were property of the estate under the Bankruptcy Act. *Id.* at 425. The court reasoned:

> In our present case the salary deductions covered a period of seven years whereas the deductions in *Kokoszka* involved only one year. Thus our present case presents a stronger record than *Kokoszka* for determining that the retirement fund accumulations are sufficiently rooted in the bankruptcy past to be included as property under § 70(a)(5).

*Id.* at 427. The court did not discuss the bankrupt's need for a fresh start.

B.C.D. 95 (D.Or.1978); *In re Mendenhall, supra; In re Boderman,* 23 Collier Bankr. Cases (MB) 302 (Bankr.E.D.Pa.1980).[12]

Responding in part to the difficulties of applying such balancing tests, Congress enacted the Bankruptcy Code, specifically creating an exemption for pension plans "akin to future earnings" and generally destroying control as a factor in determining the property of the estate. In doing so, Congress recognized the tenuous link between pension plans and "future earnings" and chose to strengthen a debtor's right to a pension; Congress also recognized the tenuous link between title and property of the estate and chose to sever the connection by expanding the definition of property of the estate.

Since the adoption of the Bankruptcy Code in 1978 it is no longer crucial to determine who has title or possession or control of assets claimed by the trustee as property of the estate, *In re Donaghy,* 11 B.R. 677, 679 (Bankr.S.D.N.Y.1981), unless the asset at issue is a spendthrift trust under 11 U.S.C. § 541(c)(2), *In re Flindall,*

105 B.R. 32, 40 (Bankr.D.Ariz.1989); *Matter of Berndt,* 34 B.R. 515 (Bankr.N.D.Ind. 1983); *In re Howerton,* 21 B.R. 621 (Bankr. N.D.Tex.1982); or community property under 11 U.S.C. § 541(a)(2). Under § 541 of the Bankruptcy Code nearly everything in which the debtor has an interest is property of the estate. The concept of control is of little practical use when property of the estate consists of "all legal or equitable interests of the debtor." However, when control is used to distinguish spendthrift trusts from property of the estate and community property from property of the estate it finds a rational basis in the language of the Code and the language of various state laws. *See* 11 U.S.C. §§ 541(a)(2)(A) and 541(c)(2).

The debtor's control of a claimed exemption is not a factor in determining the validity or extent of an exemption. To argue that an asset is not exempt because the debtor controls the claimed exemption implies the premise that all assets controlled by the debtor are not exempt. Neither the language of the Bankruptcy Code nor the

---

**12.** In *In re Mendenhall, supra,* the court held that a Keogh Plan was property of the estate under the Bankruptcy Act. While the Mendenhall court cited *Segal* for the dual purpose of 11 U.S.C. § 70(a)(5), the court did not apply the Supreme Court's test in *Segal, Lines,* and *Kokoszka.* Instead of determining whether the refund was "sufficiently rooted in the prebankruptcy past and so little entangled with the bankrupt's ability to make an unencumbered fresh start that it should be regarded as 'property' under § 70(a)(5)," *Kokoszka,* 417 U.S. at 647, 94 S.Ct. at 2434, 41 L.Ed.2d at 379, the court determined whether the debtor retained control over the funds and whether the debtor could assign the funds. *Id.* at 129. The court reasoned:

> *In re Macy* [sic.], 4 B.C.D. 94 (D.Or.1978), held that money contributed to an Individual Retirement Account (IRA) was property for purposes of § 70(a)(5). The court reasoned that the nature of an Individual Retirement Account (IRA) is similar to that of a conventional savings account because of the control retained over the funds contributed. A conventional savings account is property which passes to the trustee. *Kokoszka v. Belford, supra.* The court concluded that because IRA funds, like funds in a conventional savings account, may be withdrawn at any time and may be used for any purpose, the IRA constituted property for the purpose of § 70(a)(5). The Keogh plan in the case at bar provides for

withdrawal of contributed funds at any time [Section 3.5] and accordingly should be considered property for the purposes of § 70(a)(5).

*Id.* at 129. This Court notes that nowhere in *Kokoszka v. Belford* does the Supreme Court say anything which supports the analogy between an IRA and a conventional savings account.

In *In re Boderman,* 23 Collier Bankr. Cases (MB) 302 (Bankr.E.D.Pa.1980), the court agreed with the reasoning of *In re Mace,* 4 BCD 94, holding that "[b]ecause a bankrupt has such control over funds in an IRA, we conclude that an IRA is 'property' within the meaning of § 70(a)(5) of the Bankruptcy Act." The court quoted *In re Mace,* for support:

> As stated in *Kokoszka, supra,* it is the nature of the asset that determines whether it falls within the protective shadow of these cases. While the ostensible purpose of establishing an IRA is to put funds away for future use when the depositor is retired and in need of a substitute for wages, this Court is convinced that to treat an IA [sic] as a substitute for future wages would be incorrect in each of the ... cases where the asset was determined to be a substitute for future wages, the bankrupt had only limited control over the fund so that there was a substantial certainty that the funds would be used at a time when a wage substitute was necessary.

*Id.* at 4 BCD at 96–97; *In re Stevens,* 16 CBC 253, 260 (D.Me.1987).

legislative history supports such twisted reasoning. Such reasoning renders 11 U.S.C. § 522(d) meaningless because debtors usually own and control those assets which they claim as exemptions.

Control relates to the ownership of assets, not the efficacy of exemptions. The purpose of 11 U.S.C. § 522(d) is to provide for the basic needs of discharged debtors and the concept of control does not rationally relate to a discharged debtor's basic needs. Those courts which distinguish IRAs from other retirement plans because of the debtor's control over the IRA mistakenly apply a concept helpful in determining the property of the estate under the Act to the unrelated determination of exemptions under the Code.

Accordingly, just as a claimed exemption for a homestead or a motor vehicle shall not be denied because the debtor controls his house or his car, a claimed exemption for an IRA shall not be denied because the debtor controls his IRA.

In construing the meaning of 11 U.S.C. § 522(d)(10)(E), the Court is aided by two rules of statutory construction: 1) where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) *quoting Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); 2) exemption statutes shall be liberally construed in favor of the debtor. *Matter of Woods*, 59 B.R. 221 (Bankr.W.D.Wis.1986).

11 U.S.C. § 522(d)(10)(E) is broad in scope because the statute lists four specific types of plans which differ substantially, and a catch-all plan.[13] The four specific types of plans are a stock bonus plan, a pension plan, a profitsharing plan and an annuity plan; the catch-all plan is a "similar plan." "Similar plan" means a plan which shares characteristics in common with the four specific types of plans. *See*

*Websters Third New International Dictionary* at 2121 (1986).

■ The plans listed in 11 U.S.C. § 522(d)(10)(E) differ substantially. Treasury Regulation 1.401–1(b)(1)(iii) defines a stock bonus plan as "a plan established and maintained by an employer to provide benefits similar to those of a profit sharing plan, except that the contributions by the employer are not necessarily dependent upon profits and the benefits are distributed in stock of the employer company." A pension plan is "[a] plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees, or their beneficiaries, over a period of years (usually for life) after retirement." *Blacks Law Dictionary* at 1021 (1981). A profitsharing plan is "[a] plan established and maintained by an employer to provide for the participation in his profits by his employees or their beneficiaries." *Blacks Law Dictionary* at 1090–1091 (1981). An annuity plan is a plan funded by annuities. *See* Dan McGill, *Fundamentals of Private Pensions* at 511–514. (University of Pennsylvania 1984). Despite their differences, these plans share one important characteristic: they provide a substitute for future wages.[14] This characteristic—the provision for future wages—must be shared by any plan to qualify as a "similar plan" under 11 U.S.C. § 522(d)(10)(E).

■ IRAs also provide a substitute for future wages while differing characteristically from the other plans listed under 11 U.S.C. § 522(d)(10)(E). IRAs are domestic trust or custodial accounts created by a written instrument and subject to section 408 of the Internal Revenue Code. IRAs are designed to provide retirement benefits to individuals. H.R. No. 94–658, 94th Congress, 2d Session (1975), U.S.Code Cong. & Admin.News 1976, p. 2897 ("IRAs are supposed to be used for retirement purposes."). Accordingly, this Court finds

---

**13.** 11 U.S.C. § 522(d)(10)(E) also lists a contract on account of illness, disability, death, age, or length of service which the Court discusses on a later page.

**14.** The plans are also established by an employer. However, to claim IRAs are beyond the scope of 11 U.S.C. § 522(d)(10)(E) because they are not established by employers would render 11 U.S.C. § 522(d)(10)(E)(i), (ii) & (iii) meaningless.

that IRAs are "similar plans" under 11 U.S.C. § 522(d)(10)(E).

Some Courts argue that IRAs are not exempt because they are more like savings accounts than pension plans. *In re Talbert, supra; In re Mendenhall, supra.* IRAs are not savings accounts. *Matter of Nix,* 864 F.2d 1209 (5th Cir.1989). Savings accounts are designed to defer income for a host of reasons and, accordingly, depositors may withdraw money from a savings account at any time for any reason. IRAs like pension plans are designed to defer income for retirement. Unlike savings accounts, one may not withdraw funds from an IRA without paying a substantial withdrawal penalty of 10% and the requisite income taxes. Furthermore, bank accounts are funded solely with cash while IRAs may be funded with stock.[15] Accordingly, this Court disagrees with the argument that IRAs are more like savings accounts than retirement plans.

■ Other courts argue that IRAs should not be exempt because granting a license to convert non-exempt cash to an exempt savings account is against public policy. *In re Wright,* 39 B.R. 623 (D.S.C. 1983). Such an argument betrays a bias against exemptions which finds no basis in the language of the Bankruptcy Code and a disdain for the legislative branch which loses sight of the purpose of the Bankruptcy courts. Debtor's may plan their bankruptcies to take full advantage of the exemption laws and upon discharge debtors may do whatever they wish with their exempt property. *In re Grossman,* 80 B.R. 311 (Bankr.E.D.Pa.1987). *But Compare Norwest Bank Nebraska v. Tveten,* 848 F.2d 871 (8th Cir.1988), *with In re Johnson,* 80 B.R. 953 (Bankr.D.Minn.1987). Accordingly, this Court disagrees with the argument

that IRA exemptions are against public policy.

The legislative history of 11 U.S.C. § 522(d)(10)(E) supports this Court's construction of the statute. "Paragraph (10) exempts certain benefits that are akin to future earnings of the debtor." H.R.Rep. 595, 95th Cong., 1st Sess. 362 (1977), U.S. Code Cong. & Admin.News 1978, p. 6318. "Akin to future earnings" means the funds were "designed to function as a wage substitute at some *future* period and, during that *future* period, to 'support the basic requirements of life for [the debtors] and their families ...'" *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974). Pension benefits are akin to future earnings because they are *designed* to serve as a replacement for wages in the future. *Matter of Turpin,* 644 F.2d 472 (5th Cir.1981); *In re Nunnally,* 506 F.2d 1024 (5th Cir.1975); *Matter of Parker,* 473 F.Supp. 746 (W.D.N.Y.1979). *See* Thomas H. Jackson, *The Logic and Limits of Bankruptcy Law* at 271 (1986). Just as pensions were designed to function as a substitute for future earnings, so too were IRAs designed to function as a substitute for future earnings.

### ... OR CONTRACT ON ACCOUNT OF ILLNESS, DISABILITY, DEATH, AGE, OR LENGTH OF SERVICE ...

■ At least one court has found that an IRA is not exempt because an IRA is not payable "on account of illness, disability, death, age or length of service." *In re Fichter,* 45 B.R. 534 (Bankr.N.D.Ohio 1984). *See also In re Pauquette, supra.* While the words "on account of" are capable of several interpretations, *see,* 29A

---

**15.** Coupled with the motivation to save for retirement, the penalty and tax creates an effective deterrent against early withdrawal. To know that the penalties and the incentives actually work, one need only consider that of the $6,457,306,674 deposited in IRAs in the nation's credit unions, only 1.2% was withdrawn early and suffered a tax penalty during 1987, and only 1.27% was withdrawn during 1988. Telephone interview with Judy St. Vincent, Credit Union National Association Service Group, affiliate of CUNA Inc. To know that 10% is indeed substantial, one need only consider the headlines written and lives shaken in response to the stock market's drop of 23% on October 19, 1987, followed by a 5.9% gain on October 20, 1987, and a 10.2% gain on October 21, 1987, for a net loss of 6.9%. Sarah Bartlett, *How Bad?,* Business Week, Nov. 2, 1987, at 42; Karen Pennar, *That Rumble You Hear Is Called 'Recession',* Business Week, Nov. 2, 1987, at 44. Accordingly, this Court disagrees with those courts that consider a 10% penalty an unsubstantial and ineffective deterrent.

*Words and Phrases,* p. 229, *et seq., In re Gilbert,* 74 B.R. 1, 2 (Bankr.N.D.Iowa 1985), and *In re McCabe,* 74 B.R. 119, 120 (Bankr.N.D.Iowa 1986), this Court need not define the term "on account of" to determine whether an IRA is exempt. In construing 11 U.S.C. § 522(d)(10)(E) this Court continues to be mindful of the maxim: exemption statutes are to be liberally construed in favor of the debtor. *See In re Fisher,* 63 B.R. 649, 651 (Bankr.W.D.Ky. 1986). The phrase "on account of" only modifies the term "contract"; the phrase "on account of" does not modify the phrase "stock, bonus, pension, profitsharing, annuity, or similar plan."

Accordingly, while a right to receive a payment under any contract is not exempt under 11 U.S.C. § 522(d)(10)(E) unless such rights are on account of illness, disability, death, age, or length of service, a right to receive a payment under a stock bonus, pension, profitsharing, annuity, or similar plan is exempt under 11 U.S.C. § 522(d)(10)(E) even though such rights are not on account of illness, disability, death, age, or length of service.

## ... TO THE EXTENT REASONABLY NECESSARY FOR THE SUPPORT OF THE DEBTOR ...

█ The party objecting to an exemption has the burden of proving that the exemptions are not properly claimed. Bankruptcy Rule 4003(c). In the present case, Honda Finance must prove that the amount claimed exempt—$17,017.56—is not reasonably necessary for the support of the Debtor and his dependents. *See In re Fisher,* 63 B.R. at 651 (Bankr.W.D.Ky.1986).

In *Matter of Kochell,* 732 F.2d 564, 566 (7th Cir.1984) the Court of Appeals upheld the Bankruptcy Court's findings that the funds in question were not reasonably necessary for support under 11 U.S.C. § 522(d)(10)(E). The Court of Appeals stated:

> While Congress has limited pension plan exemptions to amounts "reasonably necessary for the support of the debtor," the statute does not elaborate on the proper interpretation of that phrase. The legislative history indicates that the federal exemptions are derived in large part from the Uniform Exemptions Act, promulgated by the Commissioners of Uniform State Laws in 1976. H.R.Rep. No. 595, 95th Cong. 1st Sess. 361, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 6317. Section 6 of the Uniform Exemptions Act defined the phrase "property to the extent reasonably necessary for the support of [the debtor] and his dependents" as "property required to meet the present and anticipated needs of the individual and his dependents as determined ... after consideration of the individual's responsibilities and all of the present and anticipated property and income of the individual, including that which is exempt." One commentator has suggested that the limitation was added to prevent officers of large corporations and professionals from placing large amounts of their assets into pension funds that would remain unavailable to their creditors, despite the fact that the individual might not have any real need for the assets. Plumb, *The Recommendations of the Commission on Bankruptcy Laws—Exempt and Immune Property,* 61 Va.L.Rev. 1, 58–59 (1975). Bankruptcy courts have generally looked to all the circumstances in determining whether there is a present or tangible future need for the pension funds, and have denied the exemption where the debtor is relatively young and has a present earning capacity. *Compare In re Clark,* 18 B.R. 824 (Bkrtcy.E.D.Tenn. 1982) (37–year–old practicing physician did not reasonably require funds in Keogh plan for future support), *aff'd sub nom. Clark v. O'Neill,* 711 F.2d 21 (3d Cir.1983) (statute's purpose to alleviate present, rather than future, need) *with In re Donaghy,* 11 B.R. 677 (Bkrtcy.S.D. N.Y.1981) (where elderly debtors were in poor health, and only support came from disability benefits, pension reasonably required for support).

*Id.* at 565. The Court of Appeals cited *In re Taff,* 10 B.R. 101 (Bankr.D.Conn.1981) for its list of factors a court should consider in determining whether funds are reasonably necessary for support under 11 U.S.C. § 522(d)(10)(E). *Id.* at 566.

[T]he reasonably necessary standard requires that the court take into account other income and exempt property of the debtor, present and anticipated, ... and that the appropriate amount to be set aside for the debtor ought to be sufficient to sustain basic needs, not related to his former status in society or the lifestyle to which he is accustomed but taking into account the special needs that a retired and elderly debtor may claim.

10 B.R. at 107. Other courts have elaborated on *Taff* to include the debtor's age, present employment, future employment prospects and general health, *In re Werner*, 31 B.R. 418 (Bankr.Minn.1983).

At the time of the trial, the Debtor was 54 years old. Unlike the facts in *In re Kochell, supra,* the Debtor in the present case was not a young man at the time of trial. Under the Debtor's IRAs he could begin to receive payments at age 59½. Accordingly, his ability to fund a new pension was severely limited by his age. The Debtor's IRAs only had a value of $17,017.56. If the Debtor had been forced to retire at the time of trial and the Debtor's return on his IRAs were 10%, the IRAs would only generate $1,701.75 per year. If the Debtor had been able to work another ten years, the IRAs may have doubled in value and generated $3,402.00 per year. Such a small pension offers little chance of becoming so large that it would generate a stream of income greater than the Debtor's retirement needs.[16] Had a decision been rendered at the trial, this Court would have found such a small pension reasonably necessary for the support of a debtor so close to retirement despite his good job and future prospects. Since the trial the Debtor has died, the pension is still small, and the future is darker yet for the Debtor's wife. Accordingly, this Court finds the IRAs reasonably necessary for the support of the Debtor's dependents.

**16.** Honda Finance argues that because the Debtor has the ability to save $600.00 per month, he can fund a new pension and the old pension—the IRAs at issue—is not reasonably necessary for the Debtor's support. The argument fails because 11 U.S.C. § 522(d)(10)(E) does not

## II. THE SECURITY AGREEMENTS AND FINANCING STATEMENTS
### FACTS

Richard Cilek owned Ladysmith Motors, Inc. (Ladysmith Motors), a Honda dealership. During the 1980's both Honda Finance and Dairyland Insurance agreed to finance the inventory of Ladysmith Motors. Both Honda Finance and Dairyland Insurance claim secured interests in the spare parts of Ladysmith Motors.

On July 10, 1980, the Debtors granted Honda Finance a security interest in certain collateral. The security agreement described the "Collateral" as "now or hereafter acquired Inventory and the Proceeds of such Inventory, together with any other property now or hereafter acquired in which Dealer has an interest." The security agreement defined "Inventory" as "all new Honda motorcycles acquired from AMERICAN HONDA MOTOR CO., INC., for which Secured Party now or hereafter provides financing, in whole or in part, and all accessions and parts, accessories and equipment attached thereto, together with all replacements, substitutions and additions thereto." The security agreement defined "Proceeds" as "all cash and non-cash proceeds received directly or indirectly from the Sale of Inventory, including without limitation all accounts, contract rights, chattel paper and instruments, and all amounts paid and/or payable pursuant to policies of insurance covering Inventory." The security agreement was signed by the Debtor as vice president for Ladysmith Motors.

On August 11, 1980, at 8:00 a.m., Honda Finance filed a financing statement with the Wisconsin Secretary of State. The description of collateral read as follows: "All Honda motorcycles for which American Honda Finance Corporation gives purchase money financing, together with any other property now or hereafter acquired in which Dealer has an interest."

speak to pensions which may someday exist but to pensions which exist at the time of filing. Furthermore, the Debtor is dead and his spouse no longer has the ability to save $600.00 per month.

On March 30, 1984, Honda Finance filed an amended financing statement. The amended financing statement changed the description of the collateral to read as follows:

All 2, 3, and 4 wheeled Honda vehicles, generators, lawnmowers, tillers, outboard motors, snowblowers, engines, water pumps, and other implements, equipment, products, and goods now or hereafter acquired for which Secured Party provides financing, in whole or in part, and all accessions and parts, accessories and equipment attached thereto, together with all replacements, substitutions and additions thereto, and cash and non-cash proceeds thereof Honda parts and cash and non-cash proceeds thereof; and accounts receivable relating to Dealer's business of selling and servicing Honda products.

The amended financing statement was signed by Edward Tomasovich as president of Ladysmith Motors.

On February 22, 1985, the Debtor signed a promissory note to the order of Dairyland Insurance in the amount of $60,000 due in one payment on May 22, 1985. The note stated that:

[t]his Note is secured by all existing and future security agreements and mortgages between Bank and Maker, between Bank and any indorser or guarantor of this Note, and between Bank and any other person providing collateral security for Maker's obligations, and payment may be accelerated according to any of them. The Maker grants to Bank a security interest and lien in any demand or savings account Maker may at any time have with Bank.

The note was signed by Richard and Rosetta Cilek and the funds were advanced by Dairyland Insurance.

On February 22, 1985, the Debtor granted Dairyland Insurance a security interest in the following:

all Debtor's equipment, fixtures, inventory (including all goods held for sale, lease or demonstration or to be furnished under contracts of service, goods leased to others, trade-ins and repossessions, raw materials, work in process and materials or supplies used or consumed in Debtor's business), documents relating to inventory, general intangibles, accounts, contract rights, chattel paper and instruments, whether now owned or hereafter acquired, and all additions and accessions to, all spare and repair parts, special tools, equipment and replacements for, all returned or repossessed goods the sale of which gave rise to, and all proceeds and products of the foregoing ("Collateral"), wherever located, to secure all debts, obligations and liabilities of any Debtor to Bank arising out of credit previously granted, credit contemporaneously granted and credit granted in the future by to any Debtor, to any Debtor and another, or to another guaranteed or indorsed by any Debtor ("Obligations").

The security agreement with Dairyland Insurance was signed by Richard Cilek, President, and Rosetta Cilek, Secretary–Treasurer, for Ladysmith Motors.

On March 4, 1985, Dairyland Insurance filed a financing statement. The financing statement described the collateral as "[a]ll New and Used Automobiles and Trucks, all Debtor's Equipment, fixtures, inventory (including all goods held for sale, lease, or demonstration, documents relating to inventory, general intangibles, accounts, contract rights, chattel paper and instruments, all spare parts and repair parts, special tools, equipment and replacements for any above-mentioned inventory)." The financing statement was signed by Richard Cilek, Rosetta Cilek, and C.D. Hegeholz, president of Dairyland Insurance.

### STATUTES

WIS. STAT. 409.110. Sufficiency of description.

For the purposes of this chapter any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described.

WIS. STAT. 409–203. Attachment and enforceability of security interest; proceeds; formal requisites

1) Subject to the provisions of Section 4–208 on the security interest of a collecting bank, Section 8–321 on security interests in securities and Sec-

tion 9–113 on a security interest arising under the Article on Sales, a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned;

(b) Value has been given; and

(c) The debtor has rights in the collateral.

WIS. STAT. 409.402. Formal requisites of financing statement; amendments; mortgage as financing statement

(1)(a) A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral ...

\* \* \* \* \* \*

(4) A financing statement may be amended by filing a writing signed by both the debtor and the secured party. An amendment which changes only the name or the address of either party need be signed only by the secured party. An amendment does not extend the period of effectiveness of a financing statement. If any amendment adds collateral, it is effective as to the added collateral only from the filing date of the amendment. In this chapter, unless the context otherwise requires, the term "financing statement" means the original financing statement and any amendments.

## HONDA FINANCE'S ARGUMENT

Honda Finance argues that its security interest in all parts held by Ladysmith Mo-

tors is superior to the security interest claimed by Dairyland Insurance in the same collateral. Honda Finance reasons as follows: American Honda Finance has had a continuously perfected security interest in Ladysmith Motors' parts since 1980. This far predates Dairyland Insurance's interest and thus is the first security interest in the parts. Honda Finance cites WIS. STAT. 409.312(5)(a) for support.

## DISCUSSION

■ A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." WIS.STAT. 401.201(37). A creditor who by law or agreement has a security interest in property of a debtor is a secured party and thus enjoys all the rights that chapter 9 accords secured parties with respect to their collateral. WIS.STAT. 409.105(1)($l$). A secured party's most important rights are, upon the debtor's default, to repossess the collateral, dispose of it, and apply the proceeds in satisfaction of the secured debt. WIS.STATS. 409.503 and 409.504. The rights to repossess and liquidate collateral that chapter 9 gives a secured party are not just enforceable against the debtor, they are also enforceable against the debtor's creditors and transferees of the collateral. WIS.STAT. 409.201.

Exceptions to WIS.STAT. 409.201 and the principle of derivative title abound. The major exceptions are rules giving priority under certain circumstances to buyers of collateral, principally WIS.STATS. 409.-301(1)(c), 409.307(1) and 409.307(2), to judicial lien holders, WIS.STAT. 409.301(1)(b), to certain suppliers, WIS.STAT. 409.310, and to other secured parties. WIS.STAT. 409.312(5). Some of these rules give priority to subsequent claimants of collateral only when the secured party has not perfected his interest in the property. "Perfection ordinarily refers to the steps prescribed by law for giving public notice of a security interest, and can be understood as the critical marking point for applying the first-in-time rule of priority to perfectible interests." [17] Epstein, Landers & Nickles, *Debtors and Creditors* at 191 (West 1987).

17. "Other Article 9 priority rules subordinate even perfected security interests to certain sub-

Perfection occurs when a security interest "has attached and when all the applicable steps for perfection have been taken." WIS.STAT. 409.303(1). A security interest attaches when the debtor has rights in the collateral, value has been given and either the secured party possesses the collateral or the debtor has signed a security agreement which contains a description of the collateral. WIS.STAT. 409.203(1). In the present case, the applicable step in perfecting a security interest is filing a financing statement. WIS.STAT. 409.302(1) & comment 5. A financing statement is sufficient if it gives the names and addresses of the debtor and the secured party, includes the debtor's signature, and "contains a statement indicating the types, or describing the items, of collateral." WIS.STAT. 409.402.

The most troublesome requirement of WIS.STAT. 409.402 is the "statement indicating the types, or describing the items, of collateral." WIS.STAT. 409.402(1)(a). Many courts cannot agree on what constitutes an indication of the types or a description of collateral in the financing statement. *See*, Annotation, *Sufficiency of description of collateral in financing statement under UCC §§ 9–110 and 9–402*, 100 A.L.R.3d 10 (1980). Division exists because the Uniform Commercial Code as adopted by Wisconsin does not define "types of collateral" and vaguely defines "description." Consequently, while the Uniform Commercial Code as adopted by Wisconsin provides two distinct ways to tell the world what collateral is encumbered by

a security interest, many courts have blurred this distinction by broadly or narrowly defining these terms. *Id.* The result is a third way to give notice of a security interest by describing collateral in a higgledy-piggledy fashion not proscribed by the U.C.C. This leads to an ·*ad hoc* interpretation of the U.C.C. by the courts instead of the intended commercial advantages arising from uniformity.

While both a security agreement and a financing statement require a description of the collateral, the description required by a security agreement differs from a description required by a financing statement. For security agreements, WIS. STAT. 409.203(1)(a) merely requires "a description of the collateral" and WIS.STAT. 409.110 merely requires a description which "reasonably identifies what is described." Such a broad rule allows the secured party and the debtor the flexibility to define collateral as they wish. After all, the security agreement is an agreement solely between the secured party and the debtor. However, for financing statements WIS.STAT. 409.402 requires "a statement indicating the types, or describing the items, of collateral." Such a rule allows the secured party to give the world notice of his security interest in the collateral. Because the financing statement speaks to the world, it must do so in a standard manner. Accordingly, WIS.STAT. 409.402 allows much less *ad hoc* flexibility than WIS.STAT. 409.-203(1)(a). While a secured party may give notice of the collateral by speaking in general or specific terms, generalizing is confined to "indicating the types" of collateral [18] and specifying is confined to "de-

---

sequent claims. These rules either protect subsequent claims that are enabling interests or they protect claims of buyers who purchase in markets where, for overriding policy reasons, property must pass freely and without concern for encumbrances." *Id.*

**18.** WIS.STAT. 409.402(1)(a) provides that a financing statement is sufficient if it "contains a statement indicating the types ... of collateral." As used in WIS.STAT. 409.402(1)(a), type means "a thing or person regarded as a member of a class or category." *The Random House College Dictionary* at 1422 (1982). "Collateral means the property subject to a security interest, and includes accounts and chattel paper which have been sold." WIS.STAT. 409.105(1)(c). The property subject to a security interest is "person-

al property or fixtures." WIS.STAT. 409.-102(1)(a). Within the meaning of the Uniform Commercial Code as adopted by Wisconsin, types of collateral refers to goods, accounts, general intangibles, documents, instruments and chattel paper. WIS.STAT. 409.105, comment 3. *See In re Becker,* 53 B.R. 450 (W.D.Wis. 1985) and *In re Boogie Enterprises, Inc.,* 866 F.2d 1172 (9th Cir.1989). Goods are classified as consumer goods, equipment, farm products and inventory. WIS.STAT. 409.109. Accordingly, if one uses any of the following terms—consumer goods, equipment, farm products, inventory, accounts, general intangibles, documents or instruments—to indicate the types of collateral on a financing statement, then the financing statement shall be sufficient if all other requirements are met. If one fails to indicate the type

scribing the items" of collateral[19]. The result is a uniform commercial code.

Such was not the case at bar. While both parties complied with WIS.STAT. 409.-203, Honda Finance failed to comply with WIS.STAT. 409.402. In the present case, the financing statement filed by Honda Finance on August 11, 1980, does not indicate the types of collateral because none of the terms which WIS.STAT. 409.105 uses to subdivide collateral appear in the financing statement of August 11, 1980. The financing statement of August 11, 1980, does not describe items of collateral because both "all Honda motorcycles" and "any other property" summarize collateral instead of itemizing collateral as required. Furthermore, "all Honda motorcycles for which American Honda Finance Corporation gives purchase money financing" does not reasonably identify the actual collateral because a reasonable man could not tell the difference between a Honda motorcycle financed by Honda Finance, a Honda motorcycle financed by Dairyland Insurance, or a Honda motorcycle owned by the Debtor. This is particularly true given the unrecorded and partially recorded transactions between Honda dealers which occurred in the present case.

Additionally, "any other property" is not a description of items but a super generic phrase which covers every kind of collateral perfectible under WIS.STAT. 409.-102(1)(a). The phrase "now or hereafter acquired in which Dealer has an interest" neither changes the super generic quality of "any other property" nor reasonably identifies the collateral in this case, the Honda parts. Accordingly, the Court finds that the financing statement filed by Honda Finance on August 11, 1980, is insufficient and failed to perfect Honda Finance's security interest in the parts sold by Ladysmith Motors to Corner Motors.

Decisions in the Western District of Wisconsin and the State of Wisconsin support the Court's decision. In *In re Becker*, 46 B.R. 17 (Bankr.W.D.Wis.1984) the debtor granted the creditor a security interest in "all farm equipment, all livestock, milk and milk products, all accounts and contract rights acquired from the disposition of milk and milk products, all livestock feed and all farm supplies." *Id.* at 18. The Bankruptcy Court, Judge Frawley presiding, held that filing a financing statement covering "All Farm Personal Property and Feed now owned and hereafter acquired [and a] 25% Dairy Assignment" only perfected the creditor's security interest in feed, a 25% milk assignment and the proceeds of said items because "more was claimed in the financing statement than in the security agreement." *Id.* at 19. Judge Frawley reasoned:

[If] the "types" and "items" language of Wis.Stats. sec. 409.402 is to retain any meaning, creditors that rely upon a general financing statement description to protect a limited security interest must not be permitted to stray beyond the generous and broad definitions found within the Uniform Commercial Code. *See In re Bennett Co.*, 588 F.2d 389, 392, 25 U.C.C. Rep.Serv. 284, 289 (3rd Cir. 1978) ("a financing statement ..., which lists collateral *less* specifically than by reference to the categories of personal property contained in Article 9, does not comply with the statutory imperative of identification by 'types.'").

In *In re Becker*, 53 B.R. 450 (W.D.Wis. 1985) Judge Shabaz upheld the decision of

---

of collateral with one of the above terms, a financing statement will not be sufficient unless one describes the items of collateral.

**19.** WIS.STAT. 409.402(1)(a) also provides that a financing statement is sufficient if it "contains a statement ... describing the items, of collateral." As used in WIS.STAT. 409.402(1)(a), item means "a separate article or particular." *The Random House College Dictionary* at 711 (1982). Within the meaning of Uniform Commercial Code as adopted by Wisconsin, describing means reasonably identifying what is described.

WIS.STAT. 409.110. Identifying means "to recognize or establish as being a particular person or thing." *The Random House College Dictionary* at 659 (1982). Reasonably means "agreeable to or in accord with reason or sound judgment." *The Random House College Dictionary* at 1100 (1982). Accordingly, if one uses words which describe each individual piece of collateral so that a reasonable man could identify the actual individual piece of collateral by using the description contained in the financing statement, then the financing statement shall be sufficient if all other requirements are met.

the Bankruptcy Court for the Western District of Wisconsin. Judge Shabaz wrote:

[T]he question here is whether "all farm personal property" reasonably identifies what is described or indicates a type or describes an item of collateral.

It is clear that the primary purpose of § 409.402 (corresponding to § 9–402 of the Uniform Commercial Code) is to provide notice to third parties of the possible claims of others. *Citations omitted.* However, the statute requires some specificity (an indication of types or description of items) so that the filing of a financing statement itself, without explanation, cannot be sufficient despite the fact notice is given to third parties of a possible claim of another.

The *Bennett* case, cited above, concerned a financing statement which identified collateral as "all assets as contained in the security agreement." The Court of Appeals held this description to be insufficient under the theory that it neither described the items of collateral nor, more importantly, indicated a "type" of property within the meaning of Chapter Nine of the Uniform Commercial Code. Types of collateral, according to the Court, included those types of property defined in the Chapter, for example § 9–109 (at Wis.Stats. § 409.109).

The Court in *Bennett* placed significant reliance on another decision, *In re Fuqua*, 461 F.2d 1186 (10th Cir.1972), as do the debtors here. In *Fuqua*, the Court faced a financing statement which claimed, as collateral, "all personal property." This was held to be insufficient because the drafters, in requiring "any description" (see § 409.110), "must have intended that some description was required to elaborate on the naked phrase 'all personal property.'" *Id.* at 1188.

*Id.* at 452. Judge Shabaz found that the description, "all farm personal property" approached the "super-generic", failed to reasonably identify anything claimed by the creditor and provided no more notice than no description. *Id.* In the present case, the description "any other property" is even more "super-generic" than the description "all farm personal property." Accordingly, Honda Finance's financing state-

ment failed to perfect an interest in the parts in question.

On March 30, 1984, Honda Finance filed an amended financing statement. Although the amended financing statement changed the description of the collateral, Honda Finance's amended financing statement is insufficient because the term "Honda parts" neither "indicates the types of collateral" nor "describes the items of collateral." Honda Finance has made the same mistake in preparing its amended financing statement as it made in preparing its original financing statement: it did not follow the directions for financing as set forth in WIS.STAT. 409.402. Accordingly, Honda Finance's amended financing statement fails to perfect Honda Finance's security interest in the collateral.

■ While Dairyland Insurance's financing statement contains more language than necessary to comply with WIS.STAT. 409.402, it correctly indicates the type of collateral with the terms "equipment" and "inventory." Accordingly, Dairyland Insurance's security interest was perfected on March 4, 1985.

The general rule governing conflicting security interests in the same collateral grants priority to the first secured party to file or perfect. WIS.STAT. 409.312(5). In the present case, while Honda Finance created a security interest first, Dairyland Insurance perfected a security interest first. Accordingly, Dairyland Insurance's perfected security interest in the collateral in question is granted priority over the interest of Honda Finance.

III. THE CLAIMS OF NONDISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(6) AND EQUITABLE SUBORDINATION UNDER 11 U.S.C. § 510(c)

FACTS

The Debtor owned and operated Ladysmith Motors, a Ford dealership with a Honda motorcycle and power products franchise, from November of 1984 to October of 1986. From January of 1977 to November of 1984, the Debtor was vice president of Ladysmith Motors. Ladysmith Motors

began its financial relationship with Dairyland State Bank (Dairyland Bank) in 1979.

On April 9, 1985, Honda Finance suspended the Debtor's line of credit for six months because Ladysmith Motors' Bank returned four checks drawn on Ladysmith Motors' account to Honda Finance for nonsufficient funds.

In May of 1985, Dairyland Bank transferred its account with Ladysmith Motors to Dairyland Insurance because bank examiners had classified a loan to Ladysmith Motors and Dairyland Bank wanted to remove this loan from its financial statement.

On October 21, 1985, Honda Finance suspended the Debtor's motorcycle line of credit because Ladysmith Motors' bank returned to Honda Finance three checks drawn on Ladysmith Motors' account marked nonsufficient funds. In a letter from Honda Finance to the Debtor dated October 21, 1985, Honda Finance permitted Ladysmith Motors to sell its current inventory pursuant to the terms of the security agreement.

Whenever Honda Finance audited the inventory of Ladysmith Motors they only checked items with serial numbers. Honda Finance never audited parts.

Sometime in February, 1986, Ladysmith Motors sold two motorcycles to Corner Motors of Cadott, another Honda dealer, for $4,588 and $5,837 respectively. Corner Motors paid Ladysmith Motors with check number 2066 in the amount of $4,588 and check number 2070 in the amount of $5,837. The checks were dated February 3, 1986, and February 4, 1986. The Debtor testified that the checks represented sale of stock. Ladysmith Motors and Corner Motors frequently traded vehicles. The Debtor testified that whenever Ladysmith Motors made a sale of Honda products to another dealer they would send the proceeds to Honda Finance within 48 hours.

Sometime in March, during the sale of the dealership to Clark Auto Supply, the Debtor sold two more motorcycles to Corner Motors. The Debtor immediately used the proceeds to pay monthly bills because Ladysmith Motors was short of cash. The Debtor intended to use the proceeds of the sale of the dealership to Clark Auto Supply to pay Honda Finance within 48 hours.

Before the sale to Clark Auto Supply, the Debtor spoke to R.W. Hegeholz of Dairyland Bank. The Debtor told Dairyland Bank that he was negotiating to sell the Honda dealership for $80,000 and that he would like to retain $10,000 for his Ford business. Later, R.W. Hegeholz called the Debtor and asked for permission to speak with Clark Auto Supply. The Debtor denied R.W. Hegeholz' request. Later, R.W. Hegeholz recommended that the Debtor take $60,000 for the business.

On March 5, 1986, Honda Finance audited the inventory of Ladysmith Motors and discovered that two motorcycles were missing.

On March 5, 1986, Ladysmith Motors sold its Honda dealership to Clark Auto Supply for $60,000. The parties allocated the purchase price as follows:

Equipment....................$15,000
Parts Inventory...............$28,000
Inventory.....................$ 5,000
Covenant not to compete......$10,000
Prepaid set-up expense........$ 2,000

The sale agreement was approved by Dairyland Bank. Of the $28,000 in parts inventory, $27,000 of parts were purchased from Honda Finance. However, Honda Finance did not finance the purchase of these parts.

On March 5, 1986, the Debtor brought the check for the sale of the business to Dairyland Bank. R.W. Hegeholz refused to countersign the check and allow the Debtor to deposit the proceeds in the Debtor's checking account. The Debtor had a deposit slip prepared in the amount of $60,000 and checks prepared in the amount of $50,000 to cover the amount owed to Dairyland Bank. The Debtor planned to keep $10,000 and use this money to pay Honda Finance for the sale of two motorcycles. However, the Debtor did not request that a check be issued to Honda Finance. The Debtor never gave Dairyland Insurance a copy of the security agreement with Honda Finance.

On March 5, 1986, the Debtor gave Dairyland Bank a check in the amount of

$55,200.64. The parties allocated the amount as follows:

| | |
|---|---|
| Interest to 3/5/86 on $20,000 ...$ | 851.51 |
| Interest payments due to 2/28/86 | $10,278.66 |
| Floor plan interest on autos to 2/28/86 | $ 5,879.84 |
| Principal Reduction on $20,000 note | $10,000.00 |
| 1986 F150 4 × 4 # 4247 | $ 6,566.44 |
| 1984 F150 # 7426 | $ 8,100.00 |
| 1979 Mustang # 9843 | $ 2,400.00 |
| 1984 Tempo # 3761 | $ 5,000.00 |
| 1979 CB750 # 0221 | $ 800.00 |
| 1982 Honda # 2837 | $ 400.00 |
| 1981 Honda # 7130 | $ 400.00 |
| 1984 CB650 # 1808 | $ 1,400.00 |
| 1976 # 3282 | $ 2,500.00 |
| TOTAL | $55,200.64[sic] |

The parties also renewed the $20,000 note listed above for the reduced amount of $10,000.

By May of 1986, Ladysmith Motors had failed to pay the monthly loan installments and to give Dairyland Bank the proceeds arising from the sale of Dairyland Bank's collateral.

In August of 1986, Ladysmith Motors began experiencing financial difficulties. At this time R.W. Hegeholz spoke with the Debtor every seven to ten days about the loans.

On October 3, 1986, Dairyland Insurance filed a complaint with the Circuit Court of Rusk County, Wisconsin, seeking an order appointing R.W. Hegeholz as receiver. The complaint alleged that Ladysmith Motors had failed to make payments upon business notes and failed to remit the proceeds in accordance with the parties' floor plan agreement. The complaint alleged that Ladysmith Motors owed Dairyland Insurance $139,459.23 as of September 12, 1986, on a series of floor plan notes, $135,893.86 on a $150,000 note dated May 2, 1985, $15,843.14 on a $14,878.70 note dated May 7, 1985, as of August 31, 1986, and $10,647.89 on a 10,000 note dated March 5, 1986. Without notice or any demand for payment on the outstanding notes, attorneys for Dairyland Insurance entered the premises of Ladysmith Motors and took over the Debtor's business. Dairyland Insurance allowed the Debtor to sell inventory until October 31, 1986. However, Dairyland Insurance maintained control of the cash held by Ladysmith Motors and R.W. Hegeholz audited the cash receipts every three days.

On October 31, 1986, the Debtors and Edward Tomasovich agreed to compromise and settle all claims made against them by Dairyland Insurance. The Debtors agreed to execute a promissory note in the amount of $12,000 secured by real estate mortgages and purchase two automobiles from the Dairyland Insurance for $4,885 secured by a purchase money security interest in the autos. Dairyland Insurance agreed to discharge all personal guaranties of the Debtors and finance the purchase of the two automobiles. The Debtor maintained ownership of Ladysmith Motors and had a reasonable time to remove all Ladysmith Motors corporate papers having no collateral value to Dairyland Insurance. Dairyland Insurance had access to records to complete its tax records for the receivership. Dairyland Insurance agreed not to pursue any claim it may have on vehicles allegedly sold out of trust to Joseph Tomasovich or Cheri Schindler. The Debtors agreed to give Dairyland Insurance certain certificates of deposit. Edward Tomasovich agreed to execute a promissory note in the amount of $50,000 at 7% payable in 10 years. Real estate mortgages and a Ford pickup truck secured the note. Dairyland Insurance agreed to discharge Tomasovich from all personal guaranties. The Debtors and Tomasovich agreed to release Dairyland Insurance and Dairyland Bank from any and all claims; Dairyland Insurance and Dairyland Bank agreed to release the Debtors and Tomasovich from any and all claims.

On November 3, 1986, the Debtors executed a notice of surrender of collateral and a bill of sale covering all new and used automobiles and trucks, equipment, parts, inventory, supplies, tools, fixtures, contract rights, franchise rights and obligations with Ford Motor Corporation, accounts or notes receivable, and any assets in the hands of the receiver.

## STATUTES

11 U.S.C. § 523(a) excepts from discharge any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C. § 510(c) the court may, after notice and a hearing

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

## DISCUSSION

▇▇ Honda Finance contends that the Debtor's failure to remit the proceeds from a sale of two motorcycles constituted a willful and malicious injury to property under 11 U.S.C. § 523(a)(6). Injury under 11 U.S.C. § 523(a)(6) includes common law conversion, *In re Donny*, 19 B.R. 354 (Bankr.W.D.Wis.1982), "the wrongful exercise of dominion or control over chattel." *Production Credit Asso. of Madison v. Nowatzski*, 90 Wis.2d 344, 353, 280 N.W.2d 118 (1979).

But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of domination without willfulness or malice. *Boyce v. Brockway*, 31 N.Y. 490; *Laverty v. Snethen*, 68 N.Y. 522; *Wood v. Fisk* (N.Y.Ct. of App.), 35 Am.B.R. 46, 215 N.Y. 233, 109 N.E. 177; *Stanley v. Gaylord*, 1 Cush. (Mass.) 536; *Compau v. Bemis* 35 Ill.App. 37; *In re De Lauro* (D.C., Conn.), 20 Am.B.R. (N.S.) 481, 1 F.Supp. 678. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

▇▇ For an act to be willful, the act must be intentional or deliberate; *In Matter of Ries*, 22 B.R. 343, 346 (Bankr.W.D. Wis.1982), for an act to be malicious, the intent must be to harm. *In re Noller*, 56 B.R. 36, 38 (Bankr.E.D.Wis.1985) ("This court has consistently adhered to the view that under § 523(a)(6), in order for a debt to be nondischargeable, there must be an intent to injure."), *See In re Anderson*, 89–C–0724–C and 89–C–0725–C, slip op. (W.D.Wis.1989) ("I believe that in the context of physical injury to a person or his property, it is proper to require that a creditor prove that the debtor knew that someone would be injured by his action and proceeded in the face of this knowledge. \* \* \* Furthermore, predicating malice on the determination that a debtor knew that his conduct would harm someone, yet proceeded anyway, advances the bankruptcy policy of providing a fresh start to the honest debtor but not to the intentional wrongdoer.") The debtor must know that his act will harm another and proceed in the face of that knowledge. *In re Anderson, supra; Matter of Ries, supra.* The burden of proof is on Honda Finance to show by clear and convincing evidence that the Debtor knew that his actions would harm Honda Finance and that he acted in the face of this knowledge. *See In re Kaufmann*, 57 B.R. 644, 646 (Bankr.E. D.Wis.1986).

▇▇ In the present case, the act in question is not the sale of the motorcycles but the failure to pay over proceeds received from the sale of the secured motorcycles. Mere failure to pay over money received from sale of secured property does not show willfulness or maliciousness. *Matter of Graham*, 2 C.B.C.2d 695, 7 B.R. 5 (Bankr.D.Nev.1980).

The Debtor testified that he used the proceeds to pay other business expenses. The Debtor further testified that he intended to pay Honda Finance from the proceeds of the sale of his business, Ladysmith Motors. To this end, the Debtor testified that he had requested sufficient "blue sky"

from Dairyland Insurance to cover his debts to Honda Finance. The Debtor believed that he had such an agreement with Dairyland Insurance. When Dairyland Insurance would not grant the Debtor the "blue sky" requested, the Debtor was unable to pay Honda Finance the full amount. Such testimony supports a conclusion that the Debtor did not intend to harm Honda Finance but merely wished to take advantage of the 48-hour grace period to pay other bills due at the time of the sale and to pay Honda Finance 48 hours later with the proceeds from the sale of Ladysmith Motors. The Debtor's appearance and demeanor made him a sincere and convincing witness.

However, the Debtor's words must be weighed against his deeds. Of the $60,000 received from the sale of Ladysmith Motors, the Debtor gave $55,200.64 to Dairyland Insurance and kept $4,799.36 for himself. The Debtor did not remit any proceeds of the sale of his business to Honda Finance. While such evidence may support a measure of doubt as to the Debtor's good intentions, such doubt lacks enough support in the record to overcome the Debtor's testimony as to intent. Accordingly, this Court finds that the Debtor did not know that his actions would harm Honda Finance and that he intended to pay Honda Finance within 48 hours of the sale.

While this Court thought it difficult to find that the Debtor did not know that his actions would harm Honda Finance and that he did not proceed against such knowledge, this Court thinks it easy to find that Honda Finance has failed to carry the burden of proof. Honda Finance did not clearly and convincingly show when the sale took place. The cancelled checks offered into evidence to prove the sale were not clearly and convincingly linked to this sale. Honda Finance did not clearly and convincingly show which motorcycles were sold. As for the Debtor's intent, Honda Finance cast no doubt upon the Debtor's testimony through cross examination or direct evidence. Nor did Honda Finance suggest that the Debtor's failure to remit the proceeds of the sale of Ladysmith Motors in partial payment of the amount owed Honda Finance showed the Debtor's intent to

harm. Accordingly, the debt is dischargeable.

11 U.S.C. § 510(c) provides that "the court may—under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."

Although the Bankruptcy Code recognizes the possibility of equitable subordination, it does not specify any standards by which the doctrine is to be applied. The legislative history states that 11 U.S.C. § 510(c) is intended to "follow existing case law and leave to the courts development of this principle." 124 Cong.Rec. H32,398 (Sept. 28, 1978).

The courts have developed three criteria for applying the doctrine of equitable subordination: "[1] The claimant must have committed fraud or other inequitable conduct; [2] The claimant's conduct must have resulted in harm to the other creditors or in an unfair advantage to the claimant; and [3] The subordination of the claim will not be contrary to the principles of bankruptcy law." DeNatale & Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus.Law 417, 423 (1985).

A subordinated claim "may be relegated to the bottommost rung of claims or may be simply allowed after rather than ahead of the claim of a party who has in some way been injured by the conduct of the holder of a subordinated claim." 3 *Collier on Bankruptcy*, para. 510.05[1] (15th ed. 1986). Claims should only be subordinated to the extent necessary to offset the injury to the debtor and its creditors. Under 11 U.S.C. § 510(c)(2), when a subordinated claim is secured by a lien, the lien is transferred to the debtor's estate under 11 U.S.C. § 541. In other words, the subordinated claim becomes unsecured and the property securing such claim becomes part of the debtor's estate.

Courts have applied the doctrine of equitable subordination when the creditor controls the debtor's affairs, *In re American Lumber Co.*, 5 B.R. 470 (Bankr.D.

Minn.1980), but not when the creditor merely advises the debtor. *Krivo Indus. Supply Co. v. National Distillers & Chem. Corp.,* 483 F.2d 1098 (5th Cir.1973). *In re W.T. Grant Co.,* 699 F.2d 599 (2d Cir.1983). In *In re American Lumber Co., supra,* the creditor established control over the debtor by establishing a "collateral" or "dominion" account under the creditor's sole control into which all proceeds were deposited. Control over the debtor's proceeds gave rise to a duty to other creditors to exercise faithfully that control.

 In the present case, Dairyland Insurance exercised substantial influence over the sale of the Debtor's business, Ladysmith Motors, and complete control over the distribution of the proceeds. Accordingly, Dairyland Insurance had a duty to Honda Finance to exercise such control fairly. Dairyland Insurance did not do so.

Dairyland Insurance knew the Debtor was trying to sell Ladysmith Motors to Corner Motors; Dairyland Insurance knew that the Debtor needed to net $10,000.00 from the sale to pay other creditors. Dairyland Insurance advised the Debtor to sell Ladysmith Motors for $60,000.00. Dairyland Insurance agreed to grant the Debtor sufficient "blue sky" to cover the amount the Debtor was required to remit to Honda Finance within 48 hours of the sale of the motorcycles. The Debtor sold Ladysmith Motors to Corner Motors and received a check payable to the Debtor and Dairyland Insurance. When the Debtor attempted to cash the check and disburse the funds according to its agreement with Dairyland Insurance, Dairyland Insurance refused to indorse the check. Dairyland Insurance forced the Debtor to disburse funds as Dairyland Insurance saw fit in order to favor Dairyland Insurance over other creditors. The Debtor had no choice but to comply and was unable to remit $10,355.00 to Honda Finance under the terms of their security agreement. The Court finds that Dairyland's misrepresentations, coercive dealings, and control over the proceeds of the sale constitute inequitable conduct which has injured Honda Finance and conferred an unfair advantage on Dairyland Insurance. Accordingly, Dairyland Insurance's claim is subordinated to Honda Finance's claim to the extent of $10,355.00.

## CONCLUSION

The Court holds as follows:

1) The Debtor's IRAs are exempt because IRAs are similar plans under 11 U.S.C. § 522(d)(10)(E) and the Debtor's IRAs are reasonably necessary for the debtors support;

2) Honda Finance's financing statement insufficiently describes the collateral and Dairyland Insurance's conflicting security interest has priority in the "parts" collateral;

3) Honda Finance failed to meet its burden of proof and show by clear and convincing evidence that the Debtor intended to harm Honda Finance and therefore the debts arising out of the debtor's failure to remit the proceeds from the sale of two motorcycles secured to Honda Finance are dischargeable; and

4) Dairyland Insurance's misrepresentations, coercion, and control over the disbursement of the Debtor's proceeds constituted inequitable conduct which injured Honda Finance and conferred an unfair advantage on Dairyland Insurance; and therefore under 11 U.S.C. § 510(c) Dairyland Insurance's claims are hereby subordinate to Honda Finance in the amount of $10,355.00.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.